Case: 7:23-cv-00093-KKC-EBA  Doc #: 103  Filed: 05/15/25  Page: 1 of 10 - Page ID#: 1900

Eastern District of Kentucky
FILED

MAY 15 2025

AT LEXINGTON
Robert R. Carr
CLERK U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
PIKEVILLE DIVISION

| | |
|---|---|
| COMPLIANCE STAFFING AGENCY, LLC d/b/a JENNMAR SERVICES, <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN RESOURCES CORPORATION, et al., <br><br> Defendants. | CASE NO. 7:23-CV-93-KKC <br><br><br> ORDER |

\*\*\* \*\*\* \*\*\*

This matter is before the Court on Defendant Hazard Coal Corporation's motion for partial summary judgment (DE 94) and Plaintiff Compliance Staffing Agency, LLC's motion for summary judgment. (DE 98.) The Court will address each motion for summary judgment in turn.

I.  Background

In this action, Compliance Staffing Agency, LLC ("Compliance") seeks to enforce two mechanics' liens asserted against coal mine properties in Perry County (the "Perry Mine") and Pike County (the "Pike Mine") of Kentucky. Compliance also seeks money damages from one defendant, American Resource Corporation ("ARC"), alleging that ARC owes it $1,736,226.27 for staffing services rendered to the Perry Mine and Pike Mine from January 16, 2023 to March 19, 2023 ("the Relevant Time Period"). Compliance asserts that ARC represented that it held a leasehold interest in the two mines during the Relevant Time Period. It further asserts that, to the best of its knowledge, ARC held a leasehold interest in Hazard Coal Corporation's property in the Perry Mine during this time.

Hazard Coal Corporation ("Hazard Coal") owns approximately 7,000 acres of surface,

mineral, and coal handling facilities in Perry County, which falls within the Perry Mine. Another defendant, Perry County Resources, LLC ("PCR"), was previously a lessee of Hazard Coal's property in the Perry Mine. Through a series of assignments, PCR gained possession of the Hazard Coal property as lessee and, notably, ARC's designee in late 2019. Hazard Coal asserts that the relevant lease was terminated in May of 2020 for nonpayment of royalty fees. Hazard Coal later sued both PCR and ARC in a separate action, *Hazard Coal Corp. v. Am. Resources Corp., et. al.*, No. 6:20-cv-10-CHB ("Lease Termination Action") for breach of the relevant lease. Now, Hazard Coal argues that because the lease was terminated before the Relevant Time Period, there is no interest that the mechanic's lien can attach to and a granting of partial summary judgment is appropriate.

## II.   Analysis

A district court will grant summary judgment when the moving party shows there is no genuine dispute regarding any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party carries this burden, the burden of production shifts to the nonmoving party to "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case. *Celotex*, 477 U.S. at 322.

At the summary judgment stage, the Court does not weigh the evidence and determine the truth of the matter. *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Further, the Court is not to judge the evidence or make findings of fact. *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435-36 (6th Cir. 1987). Rather, this Court determines whether the evidence presents

a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 251-52.

### A. Hazard Coal's Motion for Partial Summary Judgment

Hazard Coal argues that partial summary judgment is warranted in this action for the following reasons: (1) Compliance cannot provide "strict proof" that is essential to the creation of a mechanic's lien; (2) neither ARC nor PCR had an ownership interest in Hazard Coal's property during the Relevant Time Period; (3) Compliance fails to specify where its employees performed their work at the Perry Mine; (4) mechanic's liens are unavailable for staffing services; (5) insider reverse corporate veil piercing is not recognized under Kentucky law; (6) Compliance lacks standing; and (7) Compliance seeks to enforce an illegal contract. (*See* DE 94-1.) Because neither ARC nor PCR had an ownership interest in Hazard Coal's property during the Relevant Time Period, the Court will grant Hazard Coal's motion and decline to address its other arguments.

Despite the somewhat complicated factual history of this case, the underlying question is one of simple contract interpretation: Did ARC or PCR have an ownership interest in a leasehold on Hazard Coal's property during the Relevant Time Period? Hazard Coal asserts that they did not—because the Court, in a separate action, determined that ARC had breached the relevant lease by failing to pay royalties and that termination of the lease was appropriate. (DE 81, No. 6:20-cv-10-CHB.) Compliance, however, argues that because there has been no final judgment in the Lease Termination Action, the specific date of the termination has not been determined. (DE 95 at 8-9.) Accordingly, Compliance asserts that *when* the lease terminated is "an open question" and thus summary judgment

3

is not appropriate under these circumstances.[1]

Yet the "construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court." *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105 (Ky. 2003). An unambiguous contract will be enforced strictly according to its terms by assigning the contract's language its ordinary meaning and without resort to extrinsic evidence. *Id.* at 106. Thus, "[w]hen no ambiguity exists in the contract[,]" the Court must "look only as far as the four corners of the document to determine the parties' intentions." *Kentucky Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 695 (Ky. 2016). Compliance does not assert that the relevant contract was ambiguous, so the Court is constrained to the four corners of the lease to decide when termination occurred.

Neither party argues against this Court's previous decision that the lease in question *was* terminated for a failure to pay royalties. Accordingly, the Court has no reason to deviate from this prior decision. (DE 81, No. 6:20-cv-10-CHB.) The only question remaining is when the termination of the lease occurred. This question is one of contract interpretation—which is a question of law for the Court to decide. Compliance has given no compelling reason why the Court's previous denial of certification regarding the lease termination opinion indicates that the Court cannot now, in this action, resolve the legal question of when exactly termination occurred.

Paragraph 12 of the relevant Lease provides as follows:

---

[1] Compliance's position is somewhat misleading. While this Court previously noted that there could be some question as to when the lease terminated, that question looked backward, not forward. (DE 110, No. 6:20-cv-10-CHB ("[W]hile it is unclear whether the need for review might be mooted by future developments in this Court, it is clear that the issue of damages, waste, and abandonment are intertwined and *involve allegations that ARC breached the Lease even earlier than the spring of 2020*.") (emphasis added).) Even if there was an "open question" as to when the lease terminated, the Court was only considering possibilities taking place *before* the Relevant Time Period.

> In the event the Lessee fails to make any payment of royalties (either tonnage royalties or minimum royalties) or any other monetary liquidated monetary liquidated sum due hereunder within a period of 60 days within the time herein fixed for such payments, Lessor may, at its option, terminate and cancel this lease and all rights created hereunder by giving written notice by Certified Mail of its intention to declare the rights and privileges herein granted to be forfeited, and the Lessee shall have 30 days after the receipt of such written notice within which to remedy or cure its default. In the event the Lessee remedies or cures the default within said thirty (30) day period of time, this Lease Agreement shall continue uninterrupted, just as if the default had not occurred. If the Lessee fails to remedy or cure its default within said period of time, the rights and privileged granted hereunder shall cease and determine and this Lease shall become null and void and of no further effect.

(DE 96 at 6.) Here, Hazard Coal provided a notice of default on April 9, 2020. (DE 81 at 12, No. 6:20-cv-10-CHB.) Under the plain language of the lease, ARC had 30 days to remedy or cure its default. The lease would terminate without any further action if ARC failed to remedy or cure its default within those 30 days. This Court has already found that ARC failed to cure its default. (*Id.* at 29.) Because ARC failed to cure its default within the allotted period, the lease terminated on May 9, 2020. Whether the lease terminated *before* May 9, 2020, as contemplated by this Court in its previous opinion on the certification of the lease termination opinion, is irrelevant to the question of whether to grant summary judgment. Accordingly, the Court finds that neither ARC nor PCR had a leasehold interest in Hazard Coal's property that a mechanic's lien could attach to during the Relevant Time Period. As a matter of law, Hazard Coal is entitled to partial summary judgment.

### B.   Compliance Staffing's Motion for Partial Summary Judgment

Compliance has separately moved for partial summary judgment against ARC, arguing that ARC breached an implied-in-fact contract for staffing services at the Perry Mine and Pike Mine. Specifically, Compliance asserts: (1) that Compliance and ARC demonstrated their intent to be bound by the terms of their original staffing agreement

5

beyond its expiration date; and (2) that ARC failed to pay Compliance as required under the agreement during the Relevant Time Period. (DE 98 at 3.) ARC, however, argues that: (1) ARC elected not to extend the staffing agreement, showing its intent to let the agreement expire; (2) any payment to Compliance after the staffing agreement expired was made by ARC's subsidiary, American Carbon Corporation ("ACC"), not ARC; and (3) Compliance has not provided sufficient evidence showing that ARC made staffing request to the two mines after the staffing agreement expired. (DE 100 at 2-3.)

An implied-in-fact contract is not an "anticipated contract but rather a true contract that "requires an actual agreement or meeting of the minds although not expressed." *Kellum v. Browning's Adm'r*, 21 S.W.2d 459, 466 (Ky. 1929). While an express contract sets forth all the terms and conditions between the parties, an implied contract's terms or conditions can be implied from the circumstances or conduct of the parties. *Dorton v. Ashland Oil & Refining Co.*, 197 S.W.2d 274, 281 (Ky. 1946). The "circumstances must be sufficient to clearly and convincingly manifest or prove a mutual assent of minds to enter into the contract sought to be implied or established." *Kellum*, 21 S.W.2d at 463. An implied-in-fact contract must nevertheless establish "the essential elements of a contract." *Veluzat v. Janes*, 462 S.W.2d 194, 196 (Ky. 1970).

Here, Compliance asserts that it continued to supply staffing to ARC after the original agreement expired in accordance with ARC's requests for staffing. Further, it claims that it continued to send weekly invoices to ARC for its staffing services and that ARC paid only $241,568.88 towards the outstanding balance. Because the parties continued to operate under the terms and conditions of the agreement, Compliance argues that an implied-in-fact contract was established and ARC breached that contract when it failed to pay the outstanding balance for services provided during the Relevant Time Period.

First, ARC argues that its election to not extend the original staffing contract shows that there was not a meeting of the minds, and thus it was not bound by any contractual obligations following the original's expiration. However, this failure to execute an express extension of the agreement is hardly relevant if the facts show that an implied-in-fact contract was established through the parties' conduct. That is, of course, precisely what Compliance asserts happened in this matter.

Relatedly, ARC also asserts that Compliance has failed to offer "documentation to evidence that ARC" made requests to Compliance for staffing services at the two mines. (DE 100 at 3.) In making this sufficiency-of-the-evidence challenge, ARC seemingly ignores the affidavit of Compliance's Vice President, Ryan Litwinovich, that was attached to Compliance's motion for partial summary judgment. (DE 98-1.) Litwinovich states that, after the original staffing agreement expired, "[Compliance] and ARC proceeded as though the Agreement was still in full force and effect," and that "ARC request[ed] staffing services from [Compliance] [in] the same manner as during the initial term of the Agreement." (*Id.* at 2.) He further states that "ARC requested [Compliance] provide staffing services to" the Pike Mine and Perry Mine. (*Id.* at 3.)

An affidavit can be used to support a motion for summary judgment when it is made on personal knowledge, sets out facts that would be admissible in evidence, and shows that the affiant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). Here, ARC has given the Court no reason why Litwinovich's affidavit should not be considered as valid evidence in considering Compliance's motion. It is, therefore, not necessary for Compliance to provide the exact documentation of each relevant staffing request.[2] Litwinovich asserts

---

[2] The Court fails to understand how the invoices that Compliance sent to ARC do not constitute "documentation" of ARC's staffing requests.

that ARC made those requests, and that assertion has not been contradicted by any evidence in the record. If ARC denied that those requests were made, it could have filed a counter-affidavit to potentially show a genuine issue of material fact. It elected not to do so. Accordingly, there is no reason to doubt that these requests were made.

Finally, ARC argues that the payment referenced by Compliance was made by its then-subsidiary, ACC. It claims that this fact shows that ARC was not a party of any implied-in-fact contract. Yet ARC's claim is somewhat disingenuous. As Compliance points out in its reply, "[a]t the time of the wire payment, ARC and ACC had the same CEO, Mark Jensen, the same President and Director, Thomas Sauve, the same Chief Financial Officer, Kirk Taylor, and the same mailing and principal address, 12115 Visionary Way, Suite 174, Fishers, IN 46038[.]" (DE 101 at 2.) These similarities suggest that ARC and ACC are functionally the same entity. Regardless of who paid the invoice, the fact remains that the invoice was made to ARC, not ACC. Further, there is an uncontested affidavit asserting that ARC continued to request staffing from Compliance and Compliance supplied said staffing as if the terms of the original agreement had not expired. Who paid what towards the invoices' outstanding balance does not negate the record, which supports Compliance's claim that an implied-in-fact contract was formed through the conduct of the parties.

Accordingly, the Court finds that an implied-in-fact contract was formed and ARC breached that contract by failing to pay the outstanding balance. Compliance is, therefore, entitled to partial summary judgment as a matter of law.

### C. Hazard Coal's Motion to Amend the Scheduling Order

Also pending before this Court is Hazard Coal's motion to amend the scheduling order and to conduct a hearing on partial summary judgment. (DE 97.) Essentially, Hazard Coal asked for a stay in all deadlines in this matter until its motion for partial summary

judgment was resolved. Given that the Court has now considered and ruled on its motion in the above discussion, it will deny Hazard Coal's request as moot.

### III. Conclusion

For the aforementioned reasons, the Court hereby ORDERS as follows:

1) Hazard Coal's motion for partial summary judgment (DE 94) is GRANTED, in that:

    a. Compliance Staffing's claims against any interest in Hazard Coal's property and against any interest under any leasehold from Hazard Coal to any of the defendants (or any other persons) and/or in any improvements on any leasehold from Hazard Coal to any of the defendants (or any other persons) under the Perry County Lien are DISMISSED WITH PREJUDICE; and

    b. Compliance Staffing is PROHIBITED from enforcing the Perry County Lien against Hazard Coal's property and/or against any interest in and/or under any past, present, or future leasehold(s) from Hazard Coal to any of the defendants (or other person) and/or in or against any interest in any of the improvements on any past, present, or future leasehold(s) from Hazard Coal to any of the defendants (or any other persons);

2) Compliance Staffing's motion for partial summary judgment (DE 98) against ARC is GRANTED, in that ARC is ORDERED to pay the outstanding balance in the amount of $1,736,226.27 plus interest at the statutory rate from April 14, 2023 until paid in full, court costs, and attorneys' fees; and

3) Hazard Coal's protective motion to amend the scheduling order (DE 97) is DENIED AS MOOT.

This 15th day of May, 2025.

